Good morning, ladies and gentlemen. Our first case of the morning is 119-445, People of the State of Illinois v. Montana-Sebby. Are you ready to proceed? Good morning, Your Honors. May it please the Court, opposing counsel. My name is Aditha Rosario-Moore, and I'm an Assistant Appellate Defender with the Office of the State Appellate Defender, representing Montana-Sebby, the defendant appellant. Now, the defendant has raised one issue in this case, whether it was reversible error for the trial court to fail to admonish the veneer pursuant to this court's Rule 431B, where the evidence was close. The error was unpreserved, and the appellate court accepted the state's concession. The trial court's failure was error. The majority found that the evidence was not closely balanced, but the dissent found that under a common-sense assessment, quote, it is just this type of case that warrants reversal under the first prong of the plain error doctrine. And that's our position here. So this case really hinges on this court's assessment of the evidence. Now, this court applies a common-sense assessment in context of the circumstances of the case. And applying that standard to these facts, it's clear that the evidence here was closely balanced. It's similar to the evidence that was presented before this court in People v. Naylor. It's a credibility contest between two competing credible versions of the events. There's no extrinsic evidence corroborating or contradicting either version, and the case hinged on the jury's determination of credibility. Now, at trial, there were three deputies testifying for the state and three defense witnesses, including the defendant, who testified basically to two conflicting accounts. According to the state, the deputies went to the Sebi House to serve a custody order for the minor child, Ellis. And the defendant told them that the child was with her grandmother, Bonnie, on vacation. He looked at the custody order, gave it back to them and said it wasn't a search warrant, and then demanded that they leave as he was a child. Now, they tried to arrest him for the poke, but he resisted, and they had to take him from the front door down to the gravel driveway to control him. They said that the defendant was lurching around, and during that, Deputy Moore heard scratches on his knuckles, and that's why this was charged as felony resisting. But according to the defense, the deputies were belligerent and hostile, and they escalated the encounter from the beginning. They came to the Sebi House at 6 a.m. They knocked for 5 to 10 minutes. They were met by a family friend, Angela Dinkenbring, who answered the door. They tried to serve the order to her, and she said she couldn't take it because she wasn't family and she didn't live there. And they threatened to arrest her. Then the defendant came to the door and told them that Ellis and Bonnie were on vacation. They called him a liar, and an argument ensued. He repeatedly asked them to leave, and they refused, and they grabbed him, roughed him up on the gravel driveway. He wasn't wearing a shirt, so he was scratched on his back. He also wasn't wearing shoes, and the deputies accused him of resisting because they were angry at him for lying and for not letting them in to search. They also learned, McGrath admitted, that he learned that Bonnie and Ellis were, in fact, not in the house. So the defendant's account was that the deputies escalated the encounter. They didn't believe him, and they were wrong. So they had a motive to make this up. Now, neither of these accounts is implausible, and neither side presented extrinsic evidence corroborating or contradicting either version. Both sides presented photographs of injuries, but neither of those photographs went to the causation of injury. They went to the fact of injury. So the case really did hinge on the jury's determination of credibility, and as a nailer, that's a closely balanced case. Now, this court reviews a 431B violation under the first prong, and under this court's precedent in Heron, if the defendant shows clear error, and that the evidence was so closely balanced that the error alone threatened to tip the scales against him, he shows actual prejudice. So clear error in a closely balanced case must be viewed in context. If it threatens to tip the scales against the defendant, the error is actually prejudicial. Counsel, may I ask a question? The state argues that trials are fluid, complicated things. Lots of things happen. Lots of people say different things, and that there may be, in hindsight, error that occurs. And the question here would be, how do we parse out what's the kind of error that is reversible error here? The state tries to draw some dichotomy about a trivial error. Are you saying that any kind of error in a closely balanced case is enough for the case to be reversed? I think it depends on the context, and what I mean by that is, we're not arguing that there's a kind of error that's never or always going to be error. One of the state's examples was that if you have a leading question, that that's somehow a trivial error. You can have a leading question that's not a trivial error, not if it goes to the exact issue in the case. And so in this case, with the Rule 431B violation, the state has argued that there's no connection between that violation and a jury's determination of guilt. But that's just not true. Further, before I get to that, we argue in our reply that Rule 431B is anything but trivial. The way this court has enforced and interpreted the rule has shown that it's not trivial. The rule in 97 was codified, the holding in Zare, that if the defendant requests these principles, then the court has to ask the veneer these questions or it's reversible error. And then in 2007, this court modified the rule to say it's required regardless of the defendant asks. And in Thompson and in Wilmington, required that this court both ask whether the veneer, the court asks whether they accept and understand the principles. And so in this case, the connection between the violation and the jury's determination is this. Now the defendant, he testified and he presented evidence. So we're really talking about two principles here, the presumption of innocence and the burden of proof. Appreciate the significance of these principles. And you have a closely balanced case where you basically have even scales. If you have a juror who doesn't know who to believe and then says, well, maybe the deputies are more believable, I'm not sure, but votes to convict, that's prejudice. And that is actually prejudicial, that effect. And so to your question, it's not the kind of error, it's the context. And in this case, this case hinged on credibility. So a juror's understanding of both the presumption of innocence and the burden of proof is key to a fair determination of the defendant's guilt. Counsel, do you remember the discussion in Naylor with respect to whether or not the per se rule discussion in there? Are you asking for a per se rule that when there's a credibility contest without corroborating physical evidence, that it's always closely balanced in that instance? I think both sides also have to be plausible. I think that that's a part of the common sense assessment. I don't think that the rule in Naylor is different from the standard that you apply a common sense assessment to the evidence. I think that it's just explaining in that particular circumstance what a common sense assessment is. There's no contradicting versions, there's no extrinsic evidence corroborating or contradicting, and both sides are credible versions. That's a closely balanced case. So that is a per se rule. It would be, but I think why I resist saying it's per se is because the plausibility part is the common sense assessment. And so you're not removing it from the common sense assessment. Naylor, however, vehemently objected to that decision being looked at as per se, right? Right. And I would say that's because the common sense assessment makes it a case-by-case assessment. Are you arguing at all that the assessment should be under prong two and fundamental fairness? Well, we recognize that in the appellate court opinion, Justice Holdrege said that there is still disagreement. He agreed with your dissent. Your Honor's dissent, which just said that because of the importance of Rule 431B, it should be second prong. Now, we understand that this Court has found that it's not second prong. Of course, the rule is serious enough that it would make sense for it to be second prong, but this case can be decided under the first prong, because it's clear what the connection is with the Rule 431B violation in a closely balanced case. And so I just want... You're not contesting. It doesn't seem like you're contesting from your reply brief that prejudice is required. You're just saying that in this case prejudice has been shown, or do I have that wrong? No, you have that right. It's very clear. This Court's precedent is clear. The defendant has to show prejudice. But I think the disagreement is whether the defendant has to show that he was actually objectively prejudiced. So in this case, he would have to show that there was an actual biased juror sitting on the jury. And this Court's analysis of the error in Heron illustrates how you can demonstrate actual prejudice by identifying the prejudicial effect. So in Heron, the error was the jury instruction error. The trial court instructed the jury on the eyewitness identification reliability factors using the word or between the factors instead of and, and found that in a closely balanced case there is a prejudicial effect that is actually prejudicial for the defendant. Because the risk is that the jury would decide the reliability of the identification based on one factor instead of on all the factors. And this Court had the same error that it considered in Pietkowski and explained the prejudicial effect. So the Rule 431B error is analogous to that error. You can never know, almost never know, if a juror is actually biased due to the private nature of jury deliberations. You would essentially not be able to recognize this error on appeal if you were to hold that the defendant had to show an actual biased jury in this case. And the state also argued, or cited four cases where the defendant had to show an actual biased juror. And the state argued four cases to support its argument about making this objective showing. But what these cases show, again, is that clear error in a closely balanced case must be viewed in context. If the error threatened to tip the scales against the defendant, it's actually prejudicial. Now three or four of those cases, three of four of those cases, White, Williams, and Henry M.W. had evidence that was not closely balanced and are distinguishable based on that. But in the one case where the court found that the evidence was closely balanced, Johnson, this court considered whether it was error when the prosecutor remarked during closing that the defendant had the opportunity to prove his innocence of driving under the influence by taking a breath test and that he refused to do so. So this was error, but the court reviewed the closing argument and found that in context, the comment wasn't prejudicial because the defendant didn't show that the verdict would not have been the same without the comments. This court simply undertook a common sense assessment of the evidence. And the court was able to discern that the evidence here did not impact the evidence. It was not closing remarks can never be prejudicial, but it was in that context. So prejudice depends on whether there was error and whether the evidence was so closely balanced that it threatened to tip the scales against the defendant. And I'd like to just address in the time remaining just a few of the state's criticisms of the defendant's account because as we said, this case really depends on whether the evidence was closely balanced. I'd like to note that the state didn't adopt any of the majority's findings on appeal. And those findings show that the majority clearly misapprehended the evidence. They found that the family friend, Angela Denkenbring, was impeached because the deputies testified that she told them no one was home. But she testified to contrary evidence. She said that she told them she wasn't sure if anyone was home and explained that the only person that she had interacted with was Howard Sabby, who left for work around 2 or 3 in the morning. And also that the state corroborated its case by photos of more scratches. And the state's photos led to the fact of injury, not to causation. And finally, that the defendant was impeached by stipulation. Now, the defendant stipulated that Officer Martin, who had visited the home the night before, was there at 530, and he would testify that the defendant told him that Bonnie was out running errands. But the defendant testified to contrary evidence that he told them that she was on vacation. He told them that the following morning, and they actually corroborated that testimony, and so that was not impeachment by stipulation. But here the state asserts that there's no real contest between the accounts, and that the defendant's account was inconsistent, improbable, and largely uncorroborated. And the state ignores key evidence in making that assessment. As to being uncorroborated, it ignores the undisputed facts. The deputies came over to the Seve House for the third time in a 10-day period to serve an order for a child whose mother had recently died. At 6 a.m., they had just visited the night before. They admittedly knocked for five to ten minutes, and the defendant said they couldn't come in, but they remained anyway, even though they didn't have a search warrant. Even after the defendant was arrested, they still tried to go into the house, and they admitted that they learned that the child and her grandmother were in fact not there. And so this evidence corroborates the defendant's testimony that the deputies escalated the encounter. The state also points to some inconsistencies, and I believe we expect there to be inconsistencies between witnesses. In fact, under a common-sense assessment, that shows believability, because you don't expect all the witnesses to experience the same exact thing. In fact, if they had all lined up their story, that would be indicative of collusion, and it would seem false. All of the things that the state pointed to were further juried away. But what's more is the state did not take into account the weaknesses in the deputies' testimony. They were unable to recall all the aspects of the defendant's account that they were aggressive and had escalated the encounter. McGrath and Moore couldn't recall whether McGrath stuck his foot in the door to prevent them from closing it. Moore couldn't recall whether he shouted profanities. Arthur couldn't recall whether the defendant said, if maybe one of you could go into the house, and he said, if one can go in, then all have to go in. And Arthur admitted on cross-examination that he couldn't see specifically if the defendant had poked McGrath, that he admitted that there was just some sort of contact. And the defendant ultimately was not charged with the alleged poke. And so these are weaknesses for the jury to weigh. And as to being improbable, there's nothing improbable about this account. It's not improbable under the context of the circumstances here. It's not improbable under a common sense assessment of the evidence. And what the state's characterization shows that this is indeed a credibility contest for the jury to weigh. So if there are no further questions, I'll reserve my time for rebuttal. Thank you. May it please the court. Assistant Attorney General John Schleppenbach on behalf of the people of the state of Illinois. Your Honors, this court should affirm the appellate court's decision in this case, because the defendant has forfeited his contention that the trial court violated Illinois Supreme Court Rule 431, and he cannot establish the requisites for plain error review. We actually find ourselves in an uncharacteristic amount of agreement this morning that the defendant has conceded that he forfeited the error in this case. He neither lodged a contemporaneous objection, nor filed a post-trial motion raising the issue. The state has conceded that there was error here, that the trial court failed to technically comply with Illinois Supreme Court Rule 431. That is, to separately ask each prospective juror whether they understood the Rule 431 principles, including the burden of proof, the presumption of innocence, and whether they accepted those principles. And in the reply brief and this morning, it appears that the defendant has conceded that a showing of prejudice is required for first-prong plain error. And that leaves us really to start as a first point with what does that mean? And I think there is still some disagreement on that point as to what does a defendant have to show under first-prong plain error to show prejudice. The defendant seems to suggest that that prejudice can be presumed solely from the closeness of the evidence. And the court's precedence in this matter would suggest otherwise. Looking at the White decision from this court in 2011, that court made it clear that the test for closely balanced under the first-prong plain error is like the prejudice test for an ineffective assistance of counsel claim. And as this court knows, in looking at prejudice for ineffective assistance of counsel, that it isn't solely an issue of whether the evidence is closely balanced. There's a variety of things that are looked at. It's a common-sense contextual analysis. The court looks at the entirety of the record and determines did the error have an impact on the verdict. The standard there, of course, is whether there's a reasonable probability of a different result, absent the error. And in White, this court compared the first-prong analysis to that analysis and said a defendant must show that the verdict may have resulted from the error and not the evidence. And we would suggest that that is a common-sense holistic analysis that requires not just closely balanced evidence, but also some sort of logical link, at the very least, between the error and the verdict. And we can, again, see that in this court's prior cases, that the court has always looked to see, is this an error that, even though it's not serious second-prong plain error, we believe could have impacted the verdict. And after all, that is the primary difference between first and second-prong plain error. As to second-prong plain error, the errors are serious enough that prejudice is presumed. With first-prong plain error, the court looks to see, is there some link between the verdict and the evidence? And the cases the defendant has relied on show that that is what this court does. If you look at the Heron decision, the court there said, well, the error had to do with the credibility instruction. And credibility, I'm sorry, it had to do with the instruction about how to assess eyewitness testimony. And what did the state present as its evidence? Eyewitness testimony. So there, since the eyewitness testimony was important in the case, and the error had to do with something important, the prejudice was clear. The Pietowski case was pretty much the same fact pattern. That's another case the defendant has relied on. And the case that they relied on the most, the Naylor decision from 2008. They've talked about that a little bit this morning. And in that case, the court did say credibility was an important issue, and the error had to do with credibility. So again, the court said the effect of the error was, quote, unmistakable. Now here, credibility is important, but there's not an allegation that there was an error with regard to the assessment of credibility. There wasn't a jury instruction that falsely instructed the jurors about how to assess credibility. The error we have is a Rule 431 error. And in this record, there is no indication that that error may have impacted the verdict. Listen to that, really, the question here is, what is the nature of a ZEHR error? Yes. I mean, this is not exclusion of certain kinds of evidence. This is not a jury instruction that deals with one issue in the case. This is something else. And so I think perhaps we have to need to discuss a little bit about what is a ZEHR error. This court has certainly said that the importance of confirming from the jurors that they understand the fundamental principles of presumption of error, presumption of innocence and burden of proof are guarantees for the fairness of the trial. So how can we say that the preservation of the fairness of the trial is a trivial error? Your Honor, I would suggest that there are different degrees of ZEHR error. If the court had failed entirely to ask the jurors about the burden of proof, the presumption of innocence. Now, I'm messing it up. If it had failed to ask those questions entirely, then we would have nothing in the record to tell us whether the jurors understood it or not. So that record would be cloaked with the presumption of unfairness. But here, the court asked. It just asked in the wrong words. And so each of the jurors committed that they did not have a problem with those principles. And indeed, they were instructed on them again in the jury instructions. As in this court's Wilmington decision from 2011, we should presume that the jurors followed those instructions, that they understood the instructions and understood the presumptions, and they followed them. They followed the Rule 431 principles. There certainly could be records that would show something else or not show affirmatively in this case that the jurors probably did understand those principles. The Wilmington decision from this court did something else in looking at whether there was a prejudicial effect from a Rule 431 error. They looked at whether the jurors themselves thought it was a close case or had reached an impasse. And that doesn't require, we're not arguing that they would need to show that there was an actual biased juror. They'd need to get affidavits and somehow impeach the jury's verdict. What we're saying is there needs to be some logical link. And again, if there hadn't been any questions about those presumptions, then there might be. But as in Wilmington here, we can see the jurors did not take a long time to deliberate. The jurors did not reach an impasse. The jurors did not send questions about the burden of proof, the presumption of innocence. We don't know exactly how long they deliberated, but we do know that they got the case at the end of a full day of testimony, and they resolved it the same day. So we're talking minutes or hours, not days or weeks. As in Wilmington, they didn't think this was a close case. There is no reason to presume that there was prejudice here. Now, also, there's not prejudice in this case because the people's case was strong and the defendant's case was weak. We're not saying that the evidence, the closeness of the evidence is not a consideration. It certainly is. It's right there in the text. We ask whether the evidence was so closely balanced that the error alone likely tipped the scales of justice against the defendant. In this case, it was not. The state did present the consistent, credible testimony of three police officers, all of whom, importantly, saw the entirety of the events at issue here, and that was not the case with defendant's groundbreaking witnesses. And all of these witnesses did testify consistently that they went to the defendant's parents' house to try to serve a custody order, that they made contact with the defendant, who became angry at them, shouted at them, refused to take the order, said it wasn't a search warrant, started cursing, and poked one of the officers in the shoulder, at which point the officer said that he was under arrest for battery and went to grab his arm, and the defendant resisted and continued to resist as that officer and another officer tried to get his arms behind his back and restrain him. Physical resistance. And that is enough to establish the resisting under the statute, which is 720 ILCS 5 backslash 31-1. This court has made clear that this is not a hefty burden to establish resisting or obstructing the acts of a police officer. It doesn't even need to be a physical act to resist, although it was in this case. But this court has said that frustration of the valid enforcement of the law is enough in the Baskerville decision. And moreover, it is black letter law that a defendant is not justified in resisting even an unlawful arrest. That's 720 ILCS 5 backslash 7-7. So much of the defendant's evidence suggesting that the police acted unreasonably, that they acted even stupidly, that the police shouldn't have been arresting him, that doesn't matter because he's not justified in using physical force to resist even an unlawful arrest. And defendant, of course, has presented a contrary account. He argues that the police, again, escalated the situation. And again, that's not really a significant point with the law saying that you can't resist even an unlawful arrest. But his evidence is inconsistent, it's biased, and it is not corroborated. First of all, the defendant presented three witnesses to corroborate his own account. None of them was present for the entirety of the encounter. His girlfriend, Samantha Russell, did not arrive until the defendant was already in handcuffs. So she could add nothing to whether he resisted the arrest. He was already arrested when she got there. His brother, Oakland Savvy, testified that he arrived after the defendant was already engaged in conversation with the police. And he left in the middle of that encounter to get his shoes. His family friend, Angela Dankenbrink, also left to get his sweatshirt and shoes. So none of them were able to fully corroborate the defendant's account. And where they attempted to do so, their accounts were inconsistent with one another and with defendants, and in some ways consistent with the police's account. For instance, the defendant testified that he tried to remain calm and reason with the officers because he believed people deserve respect. But his own witnesses testified that he was swearing, that he was loud, that he was frustrated, that he was stern during this encounter. Oakland Savvy, the defendant's brother, testified that Deputy McGrath was the main aggressor. And the other officers didn't say or do much. But defendants said it was Deputy Moore who was swearing and making threats from the beginning of the encounter. Defendant's own witnesses did not testify to seemingly important events that defendant identified. Defendant testified that he blacked out during his encounter with the police. None of his witnesses testified to that. None of them. Defendant testified that the police grabbed him and swung him around and his head almost hit the side of the house. Seemingly a dramatic event. None of his witnesses testified to that. Defendant testified that he said to the officers, one of you can come in and search, but not all three of you. None of his witnesses testified to that version of events. Now, defendant talks a lot about what the police officers can't remember. His witnesses can't remember these very dramatic events. And of course, it was for the jury to decide that. The jury did decide that. The jury believed the state's witnesses. It did not believe what defendant presented. And that was because those witnesses were not consistent with one another. Similarly, defendant did not testify to a seemingly key event that two of his witnesses said they observed. Those witnesses, again, his brother and his family friend, testified that defendant, after being accused of battery, threw his hands up and said, I'm cool, I'm cool. But defendant didn't testify to that. Defendant testified that he was accused of battery and the police immediately grabbed him and that's when they swung him around. Swung him around and almost hit his head against the side of the house. Didn't mention the hands, didn't mention I'm cool. Seemingly key events. This shows that testimony is just not credible, as the jury in this case apparently found. I just want to get back for a minute to the whole prejudice situation. You started accurately in indicating that everybody agrees that there was error. And then when we talked about prejudice, you threw in the fact that you could look at how egregious that error is. And we didn't hear that there were general instructions given rather than particular instructions to individual jurors in looking at whether or not there's prejudice. In a 431 case, has that analysis ever been used, where you actually look at how bad the error was? I don't believe it's been used as such, Your Honor. I think if you look at decisions like Wilmington, what the court has done is sort of a holistic analysis. And that wasn't something that they focused on in that case or trying to think of another Rule 431 case. Well, Belknap, that was another Rule 431 case. And there the court resolved that case based solely on the closeness of the evidence. But I don't think there is a precedent where the court has looked at this specifically. It's looked at all of these factors. Are you saying we should? Yes. I think this court should do that common sense holistic analysis of the entirety of the record, not just in determining if the evidence is closely balanced, but also in determining whether the error alone likely impacted the verdict. That's what we would suggest to that. And do you think Thompson should be overruled? I don't think that that would require overruling Thompson, Your Honor. I think that it would be actually consistent with Thompson. Certainly could be read as consistent with Thompson. And I would also just add briefly that this is not the other cases that they're relying on. This case, as I've mentioned, is not like Naylor. It's not like Piotrkowski. There is no indication in the record that the error impacted the verdict. It also appears that today defendant has abandoned a contention that this is second-pronged plain error. Of course, this court is aware that its precedence in Belknap and Glasper would suggest that it is not second-pronged plain error. And there's no reason to depart from Dostari's decisis. Unless there are further questions, we would ask this court to affirm the appellate court's decision. Thank you. Thank you, Your Honors. I just want to address what I think is the real difference between what we're arguing and what the state is arguing, is whether there's this logical link between the error and the jury's determination of guilt. And if there is no logical link, it's hard to understand what the purpose of Rule 431B is. The burden of proof is clearly relevant to a jury's determination of guilt in a credibility contest. And what does Rule 431B mean? How could a record ever show that a juror was actually biased short of interviewing that juror? You know, in this case, the jury asked a question. They asked about the legal theory that the deputies weren't supposed to be there. And the court instructed, well, you have the law. That's what you're going to look at in determining credibility here. Back to the last question that I asked opposing counsel. Why doesn't it make sense when you're trying to determine prejudice, and everybody, again, agrees that you have to show prejudice, to look at exactly what the jury was exposed to? Now, not looking at the general questioning of the jurors as not being error. Everybody agrees it's error. But on, in fact, Chief Justice Garmon's question, why shouldn't we take a look at the overall framework, including the fact that the jury was exposed to the instructions, albeit in group form? Right. Because the requirement is not to expose the jurors. The requirement is to ascertain whether they accept. Let me just stop you. No question. And that's why it's error. I'm only saying, why shouldn't we look at it in trying to determine whether there was prejudice? Well, I think I just want to explain a little bit about when you're asking if a juror accepts and understands. You're not just asking the language. You're giving the jurors an opportunity to ask questions. You're also, the parties and the court are able to see the jurors' face. There's many ways to say yes or no. A juror can say, sure, I understand. And that's not really an understanding. And it gives the parties an opportunity to ask more questions. It gives the court an opportunity to ask more questions. So it's not simply just can you say yes to this, okay, you're on the jury. Vardir is an opportunity for the parties to get an assurance and the court to get an assurance that the jury is impartial and that it's a fair process. And so I think that's my understanding of why Thompson and Wilmington said a court has to ask both. It's not just a technical requirement. And so, insofar as that's looking at the context of the error, I believe that's what the court does. And so, yeah, we don't agree that there are these degrees of zero error. If the court fails to ask both accept and understand, there's a violation. And that's tied to a jury's determination of guilt. Because those four principles were described as basic guarantees that go to the core of particular prejudices and biases. And I think it's also important to note that in Zare, the jury there also had the general instructions about the principle. But the court found that that wasn't enough because they didn't have this opportunity to discuss during Vardir. But there's some competing interest going on, right? I mean, the fact is the issue is not preserved for appeal. No doubt about that. If it was raised, perhaps something could have been done at the time, right? So now we're left with an appeal that looks at whether there was plain error or not. And it is difficult to assess whether or not the jurors were impacted by not specifically being asked the questions. But with all those competing interests, when you look at whether the defendant was prejudiced, can't you look to see whether or not they were at least instructed, not completely not instructed on it? I understand your point. I know this is hitting the nail on the head again, but I think it's important. I understand your point as to why it's error. I don't think the state disagrees that it's error. They're just saying, hey, it's a plain error case. I think you can look at it. I don't think it's enough. I think that would be overruling Thompson and Wilmington. Could you articulate for me the rule you would like this court to promulgate in this case? I think that we're asking the court to apply its standard inherent, and that clear error in a closely balanced case must be viewed in context. Like I said, we're asking this court to presume prejudice. It's not playing with words. It's actually prejudicial because the threat is so severe that it actually threatens to tip the scales against the defendant. And that's because there's error and the evidence was so close that the error threatened to tip the scales. I believe that that's just this court's precedent. But by your argument, I take it that context in your definition would not include whether or not the judge had done somewhat of a job of talking about the zero principles and the rule, but didn't complete it. Are you saying that shouldn't be considered? I'm not really clear on what you're asking. You said that it has to be considered in context, but you've also said in response to Justice Thomas that the fact that there was an attempt, although it was not sufficient, to instruct the jury and question the jury on this issue is not enough. So should we consider that as context or not? I believe, I'm not sure if I'm understanding, but I believe, I think it's because looking at the error itself, right? I guess we're describing the error differently because I think it's a much more egregious error than the state is arguing. It's not this minor technical error. It's really the failure of the opportunity for the parties to assess whether these jurors are impartial and whether they really understand the significance of these principles. And that would be the context here. And I think also we didn't, the state said we abandoned our assertion that this should be second prong. We acknowledged it in the brief because there still remains disagreement among some justices about whether or not it should be second prong. And so this is opportunity for clarification if this court wants. But we have clearly asked this court to apply its precedent of the first prong to this particular violation. And I just want to point out in the state's going over the facts, I think the state was very selective. The fact that two of the witnesses, defense witnesses, weren't there for the first minutes of the defendant's discussion with the deputies, that's a quantitative analysis. A qualitative analysis doesn't require even numbers of witnesses to testify. In Naylor you had two police officers and one defendant. And also in Naylor you had a defendant who didn't recall every single exact detail. That goes to the jury. That is for the jury to determine. The fact that the deputies were escalating is important. It's important to an account that the police were physically hurting the defendant and escalating an encounter. It's not irrelevant. The defendant did not say that he resisted an illegal arrest. He said that the police roughed him up, that he didn't resist at all, and that he did nothing to be arrested. Those are two different accounts. And as to how the witnesses would ever know that the defendant blacked out, I'm really not sure. That's his experience of being pulled and dragged along the gravel. And I think as we said earlier, you have different witnesses testifying to different things. They didn't get together and line their stories up. They actually testified to what they experienced, and that's what you expect in a case. Before your time is up, counsel, you do make a structural error argument, right? Where closely balanced doesn't matter, prejudice doesn't matter. I think you acknowledge that our case loss is something different. In fact, that we don't find 431B errors as structural. Is that an alternative argument? We didn't present it as an alternative argument. We laid it out because it was a part of the majority's opinion. They wanted clarification on it, and so we're just acknowledging that there's still disagreement. But we're asking this court to apply the first prong of the plain error doctrine. And so in conclusion, we respectfully ask this court to reverse the defendant's conviction and remand for further proceedings. Thank you. Case number 119445, people of the State of Illinois v. Montana Sebi, will be taken under advisement as agenda number one. Ms. Rosario Moore and Mr. Schleppenbach, thank you for your arguments this morning. You are both excused at this time.